Next case, Mr. Alaniz v. U.S. Renal Care, Incorporated Next case, Mr. Alaniz v. U.S. Renal Care, Incorporated May it please the court, my name is Jack Frazee and I represent the appellant Juan Alaniz. This case is about age discrimination and retaliation. There are two issues on appeal. First is whether summary judgment was appropriate in light of evidence presented showing there are genuine issues of material fact that remain for trial. And the second is whether summary judgment is appropriate when evidence has been introduced showing that the stated legitimate reason was in fact false. For all of the reasons that we've explained in our briefs and what I will say today, we're asking that this court reverse and remand the case so that we can go to trial and test these actual facts and the evidence and the witnesses. I first want to point out that this case is on appeal from a motion for summary judgment that was made by United States Renal Care. So all reasonable inferences must be drawn in favor of the non-movement, which is Alaniz. This is also on de novo review, so the lower court's ruling is not given deference. This case involves two claims, one for discrimination, one for retaliation. And both of these are analyzed under the McDonnell Douglas test. So I'm going to begin with the discrimination claim and the prima facie case there. The lower court held that Alaniz was not able to establish the fourth prong of the discrimination prima facie case because he had not been replaced by someone younger than him or had not otherwise been discriminated against. That was incorrect because there were two employees hired to replace Alaniz. One was Delia Rocha, who was 59 years old and she was older than Alaniz and also within the protected class, but the other one was Bianca Acosta, who at the time of hiring was 26, 17 years Alaniz's junior. This court held in Flanner v. Chase Investment Services Corporation that if two employees are being hired, you look at the age of both of those employees and if one of them is substantially younger than the terminated employee, that's enough to create an inference of discrimination. In that case, Flanner was replaced by two employees. One was six years younger, the other was 27 years younger. And in that case, the district court held that that was not enough to create a fact issue or an inference on discrimination because six years younger was just too close to call. But this court held that you look at both employees and 27 is enough. That is very similar to what's going on in this case. And the reasoning from that case actually supports Mr. Alaniz's contention even more so because Delia Rocha was coming out of retirement to cover for him. It's reasonable to assume that she's going to go back into work because she's no longer needed at the company. She stayed there, what, at least a year, right? That's correct, Your Honor. And that may be in part to help train up the other employee, but there is some rational time limit on how much time she's going to spend there. A reasonable fact finder could find that that was intentionally done to help cover for the absence of Alaniz and also cover for retaliation or discrimination claim. Moving on to the Prima Facie case for retaliation. Retaliation in the district court, I didn't see where you responded to the summary judgment motion for retaliation. You responded to age and then you said somewhere you had a, I think, a contract claim that you were abandoning. I didn't see anything addressing retaliation in your district court response. I believe it was wrapped into the discussion of discrimination and that it was immediately raised as an issue that he was actually retaliated against for raising this discrimination that he was suffering. Alakaya came to the facility and made discriminatory remarks toward him and then ultimately terminated him under a pretextual reason. I think you're correct, Your Honor, that there was not a separate heading, but the arguments are wrapped up in there. I'll point out that United States Renal Care never raised an argument of waiver. The district court decided it. Summary judgment, you can't win by default, so the district court had to address it. I would point to . . . You say it's wrapped up in your age discrimination. It's a different Prima Facie case that you're about to get into. Yes, Your Honor. Yes, that is correct. All of the arguments that are necessary for the court to look to that brief, if there's any question about that, because I don't necessarily know what to say other than to urge that it's included in the brief. Moving on to the Prima Facie retaliation claim, the lower court found that that was satisfied because Alanis filed an HR complaint on April 1, 2017, and an EEOC complaint on May 1, 2017. The termination on June 17, 2017, constituted an adverse employment action, and there was a causal link because of the proximity in time between the protected activities and the actual termination. So that should hold up on appeal as well, and that was correctly reasoned. This brings us to the second step of the test, which is what is the legitimate reason for termination? And United States Renal Care claims that Alanis forged documents. So then the test shifts back to the plaintiff to persuade the fact finder. But I mean, the fact that they're wrong on that by itself isn't enough to get you the pretext. That's correct, Your Honor. You have to show they knew they were wrong, not just that they didn't do very much investigation. But it is true that the signature was forged. It just, your argument is it was forged by the husband of the patient rather than by your client. But wouldn't that support a good faith belief that it was forged? That because it was? No, Your Honor, because there are other factors that go into considering all of this. So as you mentioned, the form 2728 was signed by the patient's husband with the patient's consent. The day that Alakia confronted Alanis with that signature and accused him of forging it, he told Alakia that he did not forge that signature and that the patient was on the way to the facility and could clear up the whole issue. Rather than wait for the patient to come and talk to him about this, he told Alanis to leave immediately. And that weighs in favor of a history of whether or not these signatures were being forged. And you would think that the company would have a significant interest in actually finding out the truth there because it goes directly to patient care and how they're submitting claims to Medicare. So did they have an obligation to report Alanis if he was, in fact, forging patient signatures to some entity? It would stand to reason that they would do that. There's no evidence in the record that they actually did do that. And to support Alanis's contention that he never forged any of these signatures, he has not necessarily submitted information to the Texas Workforce Commission, the EEOC. He's asking for a trial to vindicate himself that he didn't forge any of these signatures. That's not really the behavior of a serial forger. The other factors that weigh against a good-faith belief is that the exact Form 2729 Well, let me just be more clear. I just don't know the rules for a licensed master social worker. But, for example, a lawyer who knew that another lawyer had committed forgery would have an obligation to report that to the state bar of Texas. Is there a similar situation with licensed social workers? I'm not aware of a specific rule. I would think under the ethical obligations of a professional, you would be required to do that. But I don't, honestly. And no report was made on it? I'm sorry? And no report has been made? Nothing has been filed against Alanis? That's correct. In this respect? That's correct. Or at least, that has not been introduced into evidence. And I'm not aware of any. Well, it's your client, right? Right, right. I just, the only point I'm making is You don't think you'd know if there was a That's true. Proceeding against your client on this? There's no forgery allegations, or at least nothing that's been given to law enforcement. So the other factors that weigh against United States renal care is that the Form 2728 that he was accused of forging, we showed that to Alakia at deposition and several other care plans that had been produced as alleged forgeries. And we asked him to go through, do any of these refresh your memory? Have you seen any of these? Were these part of your analysis? And he couldn't remember any of these forms or patients or reviewing them or which he had looked at. So we asked him, okay, can you identify one of these forms that looks suspicious to you? And he pointed to the Form 2728. And we pointed out to him, well, there's another signature line where you can witness the signature is authentic, and it's signed by Rebecca Perez, the exact person who was discriminating against Alanis, who reported the issue to Ryan Alakia. That weighs against a finding of good faith, because he can look at the document and see that someone else witnessed it was authentic. The other issues with their summary judgment evidence is, for example, LaQuinta Jefferson gave a declaration saying, well, we looked at the patient records, and the patient at issue on the Form 2728 didn't come in for treatment June 17, 2017. That's never been the allegation. The allegation was that she was coming June 16, the day he was fired. And so that should not be given any weight. So I'm interested in this otherwise discriminated based on age. So we have the issue of the replacement, and that's a bit convoluted, because they did replace him with somebody older. But you have this otherwise discriminated on age. Would that be this a younger person is waiting for your position kind of discussion? Because everybody keeps talking about stray remarks and that kind of thing, but that seems directly stating we want you out so we can put a younger person, as opposed to making some joke about your old, which I'm not saying is proper, but maybe doesn't count in this world. Yes, Your Honor. So that's exactly correct. There were several comments made saying, you know, we have younger people waiting to take your job. We prefer younger people. Younger people are easier to mold and move faster. Alanis reported in his complaint to HR that this was a regular occurrence. He said the same thing to the EEOC and the Texas Workforce Commission. His account has been remarkably consistent the entire time. And this brings me to another fact that weighs against United States renal care for a good faith belief, which is that the actual alleged forgeries grew significantly over discovery, because initially they were saying it's a Form 2728 and some care plans. Then we do a deposition of Rebecca Perez, and at that deposition, she's asked to estimate how many are we talking about? She said, well, it's probably over 200. So we asked, OK, have you produced those documents? And afterward, we were given a whole new batch of documents. So that hasn't even been a consistent explanation. And all of these things should weigh against United States renal care, especially on summary judgment, where the non-movement is entitled to all reasonable inferences. So for all of these reasons, unless the court has any additional questions, we ask that you reverse and remand the case so that we can take it to trial and actually have these cases weighed by a jury. Thank you. Good morning. May it please the court. My name is Laura De Leon, and I represent the defendant in the appellee U.S. renal care in this case. The court should affirm the decision of the trial court here granting summary judgment to U.S. renal. There are no material facts in dispute, and U.S. renal is therefore entitled to judgment as a matter of law. As we've stated, the plaintiff, Mr. Alaniz, cannot establish even a prima facie case of age discrimination. So why are not these comments, because these aren't just, you know, inappropriate jokes, which maybe you can disregard in this context. Again, I'm not saying they're proper. But to actually say a younger person is waiting to take your job, why isn't that bordering on direct evidence of discrimination? I think you need to look at, that's a good question, Your Honor. I think you need to look at the timing and the context in which that statement was allegedly made. First, Mr. Alaniz alleges that that statement was made months before his termination. His termination occurred in June of 2017. These allegations occurred far. In January. I mean, that wouldn't be enough for just temporal, you know, like when you have retaliation based on temporal connection. But isn't that evidence of we're on a war path trying to find a way out here, and because we want to replace you with somebody younger, then in March saying younger employees can move more quickly and be, quote, more easily molded and so forth. These are direct statements. They're not just inappropriate jokes. Well, it is a statement that is remote in time, made by someone who is not a decision maker in connection with the termination decision. The evidence in the record shows that the termination decision was made by Ryan Alakaya in consultation with Human Resources, LaQuinta Jefferson, and Susan Gonzalez. But Perez was his supervisor. Perez was the unit manager, but she was not involved in the decision to terminate his employment for the falsification of patient records. These comments were made outside of that context and in the context of discussions with Alaniz where he was joking about how old he was. So with that, it's not a comment of out of the blue, we don't like old people and we're going to get rid of you kind of thing. It's a context of a conversation with him when he had a self-deprecating comment about himself, and there is a discussion with the unit manager, allegedly, over that comment. So, again— Perez was the one gathering the grievances, turning them into Human Resources. I mean, to say that Perez was uninvolved in the firing is a little— Well, she was not a decision maker. You're correct. She did collect grievances, and there were a couple of grievances at issue here. One is the investigation into the falsified documents. She was involved in that because that complaint was raised to her as the unit manager. She brought that forward to Mr. Alakaya, and Mr. Alakaya said, now go do some diligence. Send me these documentation. Go call these patients and ask them if they signed these documents, which the patients said we did not sign these documents, and then Mr. Alakaya did his own discussion with Alaniz after that. The other context of the grievances, Your Honor, which I believe you might be referring to, are after Mr. Alakaya had a meeting with Alaniz and Ms. Perez after he submitted his internal grievance. He had sort of a get-together with him and the unit clerk saying, hey, let's try and solve these issues together. Ms. Perez raised during that meeting, well, you know, there are co-workers who are raising complaints about Mr. Alaniz's behavior in the workforce. That's when Alakaya said, go get me proof of these other allegations, and those are the statements also that I'm assuming you're referring to, too, but those are the second elements of statements and grievances that Ms. Perez was- But then why does he get this glowing performance review at the end of April? So the performance review, if you look at the time frame in which the performance review was set to address, it was the beginning of his employment, which was August of 2016, to the end of February 2017. During that time frame, and this is what Ms. Perez's testimony was about, I was evaluating him during that time frame. These other issues were coming up afterwards, and she didn't want to- that's a different time frame. That's not covered by the review period, and that's why that was not reflected. That's one way to look at it. I guess the other way is April 27th, great performance review. Just a few days later, I think it's May 1st, he files the EEOC complaint, and then things quickly go downhill, and within, what, six weeks, he's out of the company. I mean, that does seem to paint a strong chronological link, at least the jury could find. It could, and that's a temporal proximity issue with the retaliation claim. He went to the EEOC in early- But it's not just a temporal proximity. It's that he had this a few days before the EEOC complaints fired. He's a great employee. Based on the time frame of that- Based on the performance review, your document. Based on the performance review up until February. Now, these issues started coming up with the other employees in March and April, and there are employee statements to that effect supporting that, but that's not why he was terminated. He wasn't terminated because of his interpersonal issues with the co-workers. He was terminated because of the falsification of patient records, and counsel has spent time talking about the 2728 form with the one patient and her husband. There were other documents at issue, which we cannot ignore, and we should not ignore, that Alakia based the termination decision on. It's not just that 2728 Medicare form. There were patient care plan documents, and we submitted- What did Alakia say at the time? I thought it was just the one form. No, he said patient care plans and a 2728 form. He referenced- That was one 2728, and then the patient- Correct, and then the patient care plans, and we submitted the other- How common is it for people to sign for their spouse or their parent when they're being treated? There's nothing in the record about that, so I can't point the court to a specific issue with that. If that is to happen, they need to have a power of attorney, and so because these are documents, the 2728 in particular is being submitted to the government for Medicare payments, so it is a pretty serious document. You want to ensure that the appropriate people are signing- The wife is sitting there and just has trouble because her hands are arthritic and says, sign for me. Is that a forgery? There is nothing in the record to indicate that was the situation, and I don't think- There is for the 2728. Well, there was that. You also, Your Honor, respectfully need to look at the information that US Renal Care had at the time it made the decision. This information about that patient's husband and his, what we contend is a faulty declaration coming in after the fact to say, I signed for her this one form. That's well and good, but looking at the information that Alakia and US Renal had at the time, they didn't have that information about the 2728. Plus, there were all these other patient care plan documents. Again, we illustrated that in our briefing, and you don't have to be a handwriting expert to see the difference in the signatures that were there. They had a very reasonable belief that these documents, these signatures were not correct. Mr. Alanis was the one responsible for them. When presented with these documents, he did not give an excuse. What came up after the fact is different. At the time, when we're looking at the reasonableness of their belief in making this decision, it's the information- But on the 2728 form, he specifically said, those folks are on their way. Why don't you wait and ask them? Why isn't that? Because if you show that one of the purported forgeries isn't a forgery, maybe that begins to question the others. Because when you're talking about caring for people that are quite ill, this notion that perhaps they're directing their child, spouse, to sign for them doesn't seem shocking to me. That seems like that could happen. It's not a regular occurrence. It can happen. I will absolutely concede that, Your Honor, that that could happen from time to time. And that would be quite different from him signing with the person unknowing and so forth. I mean, that's just a whole different world. Maybe that's not something Medicare approves of. That's a separate question. But that's different from him committing a forgery. There is no evidence of that in the case. And it's not so much that there's no evidence that that was the case with these other documents. And to go back with the issue with the 2728, even though if you give all credence to Mr. Alaniz's testimony that he said, hey, these patients are coming in, a couple of things. They never came in that day to dispute that. If we can go down a path and say, well, what if the husband or the patient came in that day and said, hey, you got it wrong? They never did. That didn't happen. There's no evidence of that happening. Furthermore, there is no evidence that the husband ever sent his letter to U.S. Renal Care. They never got it except through this litigation. And there's nothing in his affidavit or the testimony of any of the witnesses that said, we got this letter before this litigation commenced. Going back to the chronology, we talked about the performance review. June 8th, basically just a week before the termination, what do you do with Dr. Badia slamming the door after mentioning the EEOC filing? And that is plaintiff's allegation with respect to that. A couple of things. One, Dr. Badia is not a decision maker at all. The medical director of the clinic is not an employee. I'm sorry. I don't mean to interrupt you. Explain to me how the medical director works. He is a contract with the facility. The facility, and I'm going a little bit outside the record here. He is not an employee. That is in the record. He is not an employee of U.S. Renal Care. Each facility has to have a doctor. They contract with an independent doctor to oversee those patients. He is not a manager, supervisor, agent, employee at all of U.S. Renal Care. He is a separate entity. He certainly was not a decision maker in connection with the case. But that makes it seem like he really, unless other people were upset about the EEOC complaint, why would he care then? I mean, how did he find out about it? I can't speak to that. There's absolutely no evidence of that. And furthermore, there's no evidence. I'm sorry, Your Honor. I don't mean to speak over you. No, go ahead. I was going to say there's no evidence in the record that Alakia knew of the EEOC charge. The only thing that was sent was on May 17th, Ms. Jefferson gets one of those automatic emails from the EEOC that says a charge has been filed by Mr. Alanis. It doesn't say what it's about, other than the AGE Act. It goes to her. There is no evidence that Ms. Perez knew about it, that Mr. Alakia knew about it, that Ms. Gonzalez knew about it, and certainly Dr. Badia. But if you give credence to plaintiff's testimony, then he somehow knew about it. But I would say another issue with the potential retaliatory motive, all we're talking about is a temporal proximity here. We have no evidence they knew about it. But if you look to just a few months prior, when plaintiff filed his internal grievance, the document that he taped to Rebecca Perez's door, he testified, and this is in the record, that when Ms. Gonzalez and Mr. Alakia talked to him about his grievance, they were respectful to him. They were understanding. They didn't have any problem with him raising this grievance. Ms. Jefferson reached out to him to talk about this grievance, too. They exhibited no retaliatory animus. But there is a big difference, though, between taping something internally on someone's door and filing with the— It's still a complaint of discrimination. I know, right. But there is—it's understandable that one might provoke much more of a reaction. That's an inference one could draw. There's no evidence of any other retaliatory comments by Alakia, Jefferson, Gonzalez, or Perez over the EBOC charge or over the internal complaint that he made. All that they have is the temporal proximity. That's it. And that's pretty good, pretty close. But under this circuit's law, you need more than that. You need more than just temporal proximity. You've got the morsel in him by someone who's influential, even if he's not the cause, and you've got the temporal proximity. And you've got all these other issues with whether or not this forgery is— because you have other people involved in these documents, not just Alanis, et cetera. So, I mean, there seems to be—it just seems highly fact-bound, this case. I mean, I think you could win in the end. That's not my point. It's just more that this just seems highly fact-bound to be a summary judgment case. Well, Your Honor, if you look and focus on the issue of the stated law in this circuit about second-guessing personnel decisions and giving the employer the reasonable belief, did they act reasonably based on the facts before it at the time it made the decision? We need to avoid the Monday-morning quarterbacking with all this additional evidence that plaintiff is throwing in now to try and cast shadow on the decision that was made based on the facts that Mr. Alikhala had before it. And recall that he also asked Ms. Perez and Ms. Silva, the dietician who first brought this issue forward, go talk to the patients who signed the care plans that you have questions about. And those patients said, those aren't our signatures. That is important information that Alikhala had in front of him, too, so that should not be discounted as well. You didn't assert waiver on the retaliation claim, given that the plaintiff didn't respond in the district court? We did not call that. I don't think we specifically called that out in our reply. The plaintiff did certainly seem to conflate the two, kind of the two issues in his briefing. He says he was retaliated, I guess. I looked at the district court briefing. There's not a word about retaliation in the summary judgment response. Not a word. And we would assert that he has waived that as well. Okay, but you can waive waiver. You waived the waiver by not raising that. Have you? No, we did not waive. We did not raise that. You didn't raise it. So is it not a waiver of the waiver? I'm sorry, I don't mean to laugh, Your Honor. I suppose that, yes, it would be if we did not raise it below. But the same facts that apply, I think, it all comes down to pretext. It all comes down to the motivations for terminating. It all comes down to, is there any other evidence of discrimination existing here besides just his, after the fact, attacking of the decision? And there really isn't any. Well, it's such a long list of comments and questionable things and temporal. I mean, that's why I say it seems extremely fact-bound to me for a summary judgment case. But that doesn't mean you won't prevail here. I understood. I understood. And these are tricky cases. I will. If I may add, though, with respect to the various allegations he raised internally, a number of them did reflect age. A lot of them also reflected interpersonal issues. You know, he was upset that he was being paged over the intercom. He was upset that someone would knock on his door when he was in with a patient. There's a lot of other issues. He was upset that he wasn't asked out to lunch. But some of that upset. So the problem, this is all very nuanced, and that's why I say it's very fact-bound. So normally you would say paging somebody on intercom, how is that discriminatory? But if everybody else, you just say, hey, Jane, how are you? Hey, John, how are you on the intercom? That can be seen as, well, you're saying he's elderly and he can't hear you and whatever. And that's what I'm talking about. That's very nuanced, but it's still part of the factual situation that he's asserting. He's saying he was being treated differently because he was perceived as old, not because there's something wrong with calling people on the intercom. Well, that's, I don't think there's any evidence in the record that would support that one way or the other, but I mean, if we want to have a hypothetical about that, that could be a basis why someone would be upset. No, I mean, that's his evidence that people were doing things with him. Oh, we need to speak up and whatever. And I'm not saying there's anything wrong with speaking up when someone needs that. My mom was profoundly deaf, and you had to speak louder to her. And this had nothing to do with age. It was a condition she had. But you did it respectfully, obviously. But that doesn't mean that everybody who's over 40 needs to be shouted at. That's what he's saying. Well, and that would go to, I think, more his retaliation claim than his discrimination claim because there is no evidence that he was singled out for that sort of behavior at all. There is no evidence that he was the only one who was being paged on the intercom. The testimony and the evidence is that he felt it was unprofessional for them to do that and due to patient care and patient confidentiality. But the unit should have been run in a different manner. And so that is what I believe that the record would show on that. I understand what you're saying, Your Honor, and just respectfully say the record would indicate that his complaints took a little bit of a different flavor and focused more on the professionalism of what he perceived was going on there, not that he was being singled out. He was certainly not the only individual over 40 at that facility. So but that's the tenor. And when U.S. Renal Care looked into his allegations, recall that Alakia and Gonzalez inquired further about his allegations. Ms. Jefferson and Human Resources inquired further about the allegations. And the way that they addressed them was to bring people together and say, OK, let's get some common ground here. We're going to treat people respectfully. We're going to put the patients first. We're going to play nice in the sandbox, everybody. And so that's how the issue is resolved. And once they had that meeting, there is there is absolutely no evidence of any internal further internal issue or complaint by Mr. Alanis after that point in time. So if there are no further questions, I was going to go back and revisit the pretext issue. But if there are really no further questions from the panel, I'll see the rest of my time. Thank you. Thank you, Your Honors. There are multiple points I want to address here on rebuttal, and I'm going to begin specifically with whether they had a good faith belief, because I think that's the most controlling issue here on appeal. Alanis immediately protested the reason he was being terminated for. U.S. Renal Care has said multiple times in their brief, and it seemed to be said here that he did not protest that. He said nothing in response. Mr. Alanis' testimony the entire time has been that he protested this vehemently. And what about these forms besides that 127? I'm glad you asked about that. So when Alakia came to the facility to look into this forgery issue, he was there for two days. Alanis testified to all of this. He came to him the first day. He said, are you responsible for getting these care plans? And when he explained to him, no, it's me and other people as well, including Norma Silva. He said, OK, forget what I said about the care plans and was seen talking to Rebecca Perez about this. The second day, he comes over and asks Alanis about the form 2728, which he thinks, OK, Alanis is the only one that's responsible for this, so I've got him, you know, comes in, throws that at him. He tells him, I didn't forge that document. The patient's on the way. Let's wait and talk to the patient. And rather than do that, Alakia told him to pack up his things and leave immediately. We know that Alanis was having an issue with the way he was being talked to there because Alakia wrote on the counseling form at the bottom, patient refused to sign and stormed out, showing that he's protesting what he's being told. He does not agree with that. He's maintained that exact same argument all the way through the litigation. And as far as the argument that the only discriminatory comments that were made were Rebecca Perez early on and then it was corrected and there's no issue, that's also just not supported by the evidence. The EEOC claim and the complaints submitted to them, including the formal grievance letter that Alanis sent April 24th, shows that he felt Alakia was retaliating against him in that first meeting when he came to talk about Perez's discriminatory comments and all the other issues with the staff. And he listed three specific comments that he said were retaliatory. First thing he said when he walked in was, can we get beyond this? And then he told him, the medical director will always side with the facility administrator. Do you understand this? Then he said, there were no problems here until you came on board. All of that is indicative of retaliatory behavior. And the reality is Alanis followed all of the procedures he was supposed to do. The policy handbook tells you how to raise complaints internally at United States Renal Care and that handbook is in the record as well. It says you raise that issue internally to your manager, then you raise it to HR and you keep escalating it so that you can try and get that problem resolved. Well, Alanis tried to do that. He talked to Rebecca Perez. He didn't feel like she was taking it seriously. He talked to HR and he felt like it was getting a little bit better, but Alakia was brought in to talk to him about it and made three comments he thought were retaliatory. He testified that he felt like it was continuing to escalate and ultimately he filed a complaint with the EEOC. He sought all available remedies that he's supposed to do in this context and still got terminated for a demonstrably false reason. And as far as the care plans go, that shouldn't be given weight because they know other people have the ability to get those signatures and when he first asked him about it, he walked away as if, okay, well, that's not enough to pin on Alanis. We're going to have to find a form that only he has control over. All of that should weigh in favor of Alanis, especially when we're here on summary judgment and all reasonable inferences need to be given to Alanis. And as you mentioned, Judge Haynes, this is a largely fact-specific appeal. That's because these facts and evidence and witnesses need to be given to a jury so that can weigh the credibility of these different witnesses. There were only three people that were deposed, Alanis, Alakia, Rebecca Perez. Alakia and Perez are the two people that have been identified as taking discriminatory actions toward Alanis. So to say that Alanis has a subjective belief and it's not enough to meet discrimination and that their belief was good faith simply weighs the testimony of two witnesses that Alanis has an uninterested third party testifying in his favor, supplying an affidavit saying, I signed for that form. And as far as the comment that the patient didn't come in for treatment that day, again, I have to point to the LaQuinta Jefferson declaration that said she didn't come in on June 17th, which has never been the allegation. The allegation is she was coming in that day, June 16th. So whether they looked through the records and saw that she wasn't there on June 17th is totally irrelevant. It has nothing to do with whether she actually came and tried to get treatment or whether this is actually true for Alanis. So for all of these reasons, we respectfully ask this court to remand the case in reverse so that we can take this issue to trial. Thank you, counsel. The court will take a brief recess.